## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HEATHER HAMILTON**, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-01986 (TNM) |
| **NATIONAL RAILROAD PASSENGER CORPORATION**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Heather Hamilton argues that her former employer, the National Railroad Passenger Corporation ("Amtrak"), interfered with her ability to take leave under the Family Medical Leave Act ("FMLA") and unlawfully fired her for taking such leave. Amtrak disagrees that it interfered with Hamilton's leave and contends that it fired her for upgrading a customer for free in violation of its policies. It moves for summary judgment. As explained below, the Court finds that no reasonable jury could find in Hamilton's favor. The Court will therefore grant Amtrak's motion.

### I.

Hamilton began working for Amtrak in 1997. Pl.'s Statement of Material Facts in Genuine Dispute ("PSDMF") ¶ 16, ECF No. 20-1.[1] She started as an Auto Train Attendant and

---

[1] The Court relies in large part on the facts in Hamilton's statement that are undisputed. Amtrak moves to strike numerous statements within Hamilton's filing for failure to comply with this Court's standing order. *See, e.g.*, Def.'s Resp. to Pl.'s Statement of Facts ("Def.'s Resp.") ¶¶ 2, 10, 11, 15, ECF No. 22-1. While some of Hamilton's responses may not comply with the directives in the standing order, the Court does not find that striking these statements is warranted. These motions will therefore be denied.

then became an Auto Train Customer Service Representative ("CSR")—both positions were based in Lorton, Virginia. *Id.* ¶¶ 16–17. CSRs are responsible for, among other things, providing ticketing services to passengers and checking them in before boarding. *Id.* ¶ 18.

Hamilton took intermittent and continuous leave under the FMLA while working for Amtrak. *See* Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 20, ECF No. 19-1; PSDMF ¶¶ 20, 137, 142, 148, 152. As relevant here, Hamilton requested intermittent leave to care for her daughter in October 2017 based on medical documentation that her child's condition could cause flare-ups three times per year for three to five days per episode. PSDMF ¶¶ 21–23. Amtrak granted this request, which allowed Hamilton to take intermittent leave throughout a one-year period. *Id.* ¶¶ 22, 142; Pl.'s Mem. in Opp'n ("Pl.'s Mem.") Ex. B-1 ("Pl.'s Warner Dep. Exs.") at 9, ECF No. 20-5.[2] Before the expiration of the one-year period, Amtrak requested that Hamilton "recertify" her request because it believed Hamilton's absences went beyond the amount of approved leave—specifically, absences occurring three times per year for three to five days per episode. *See* PSDMF ¶ 146; Pl.'s Warner Dep. Exs. at 9, 12, 14.

In November 2018, Hamilton again requested intermittent leave to care for her daughter. PSDMF ¶ 27. This time, the medical documentation accompanying her request reflected that her estimated absences would increase to accommodate appointments twice per month for two hours each and flare-ups five times per month for eight hours per episode. *Id.* ¶ 149; Def.'s Resp. to Pl.'s Statement of Facts ("Def.'s Resp.") ¶ 149, ECF No. 22-1. Amtrak approved this request the next month, which allowed Hamilton to take intermittent leave for a one-year period. PSDMF ¶¶ 28, 148; Pl.'s Warner Dep. Exs. at 17.

---

[2] All page citations refer to the page numbers that the CM/ECF system generates.

Hamilton also took continuous FMLA leave.  She requested leave for a ten-day period in which she was absent from work because of personal issues.  PSDMF ¶¶ 30, 151.  Amtrak approved this request.  *Id.* ¶¶ 32, 152.

Over the course of her employment with Amtrak, Hamilton was subject to discipline several times for, among other things, unauthorized absences and tardiness.  *Id.* ¶ 33.  Rule 24 of the Collective Bargaining Agreement ("CBA") between the Transportation Communications Union and Amtrak, which governed Hamilton's employment, provides that employees must receive notice and "a fair and impartial investigation" before being disciplined or dismissed unless the employee accepts the discipline or dismissal in writing and "waive[s] formal investigation."  Def.'s Mot. Summ. J. ("Def.'s Mot.") Ex. B ("Def.'s Hamilton Dep. and Exs.") at 74, ECF No. 19-4; PSDMF ¶¶ 13–14, 39.  Hamilton repeatedly waived the investigations.

Amtrak issued Hamilton at least five Notices of Intent to Impose Discipline for the alleged violations.  PSDMF ¶¶ 38, 42, 44, 46, 48.  It later withdrew one of these discipline notices because Hamilton had in fact obtained approval for the absence.  *Id.* ¶ 48.  For at least three of the remaining four incidents, Hamilton waived her right to an investigation, opting instead to accept the discipline imposed.  *See* Def.'s Hamilton Dep. and Exs. at 139–40, 150–52, 157–58; *see also* PSDMF ¶¶ 43, 45, 47.[3]

At the center of this case are other disciplinary proceedings in which Amtrak charged Hamilton with providing a passenger a free upgrade in violation of Amtrak's policies.  On January 23, 2019, Amtrak Lead Service Attendant James Davis noticed that one frequent passenger, Jack Kelly—who departed from Hamilton's Amtrak station—had been upgraded to a

---

[3]  Hamilton states that she did not sign the waiver of investigation of the fourth notice.  *See* PSDMF ¶ 41.

deluxe "roomette" but had only paid for a coach seat.  PSDMF ¶¶ 60–63.  Davis contacted a Lead CSR at the Lorton station, Cynthia Thurston, who reviewed Kelly's boarding pass and recognized the handwriting on it as Hamilton's.  *Id.* ¶ 65.

Amtrak then investigated the incident.  Station Manager Jacqueline Clark, Hamilton's supervisor, determined that Hamilton had checked Kelly in and issued him the upgrade without charging the added fee, which led to a $471 loss for Amtrak.  *Id.* ¶¶ 69, 73–74.  Clark recommended that Hamilton be suspended for 30 days, but Superintendent of Station Operations and Customer Service Michael Jerew instructed that formal charges be brought against Hamilton and that she be removed from service in the interim.  *Id.* ¶¶ 75, 77.

In accordance with Rule 24 of the CBA, a hearing was held in which both Hamilton and Amtrak could present witnesses and evidence.  *Id.* ¶¶ 81, 83.  The Hearing Officer who presides over such a hearing must impartially determine whether the charges are proven, but she does not decide whether discipline is warranted.  *Id.* ¶ 95.  Hamilton was represented at the hearing by a union representative.  *Id.* ¶ 82.  Among other witnesses, Amtrak presented Davis (who testified about his discovery of the upgrade) and Thurston (who testified that she recognized the handwriting on Kelly's boarding pass as Hamilton's).  Def.'s Mot. Ex. D ("Def.'s Jerew Dep. and Exs.") at 53–63, 75–76, ECF No. 19-6; PSDMF ¶¶ 85, 87.

For her part, Hamilton testified that, although she checked Kelly in on January 23, Second Lead Agent Luis Figueroa instructed her to upgrade Kelly.  Def.'s Jerew Dep. and Exs. at 113–14, 123; PSDMF ¶ 92.  She also related that she and Kelly did not share a personal relationship.  Def.'s Jerew Dep. and Exs. at 113; PSDMF ¶ 93.  Kelly testified on Hamilton's behalf, as well, stating that she did not upgrade him and that, while he brought station employees pizza and gave them holiday tips, he and Hamilton did not have a personal relationship.  Def.'s

Jerew Dep. and Exs. at 99–102; PSDMF ⁋ 91.  Figueroa did not testify at the hearing, as he was on vacation.  PSDMF ⁋⁋ 81, 83.

The Hearing Officer concluded that Hamilton issued Kelly the upgrade on her own, without being directed by Figueroa.  Def.'s Hamilton Dep. and Exs. at 226–28; PSDMF ⁋⁋ 99–106.  The Hearing Officer relied in part on the work schedule, which showed that Figueroa was working outside on the day of the incident, not at the ticket counter.  Def.'s Hamilton Dep. and Exs. at 228.  She concluded that Kelly's testimony on Hamilton's behalf was "unpersuasive" because his recollection of what had occurred was "fuzzy," but she noted that Kelly did not recall seeing Figueroa—a person who he knew.  *Id.*  In the Hearing Officer's view, nothing else in the record corroborated Hamilton's assertion that Figueroa told Hamilton to issue the upgrade. *Id.*

After the Hearing Officer's decision, Amtrak investigated further.  Jerew interviewed Figueroa to determine whether he directed Hamilton to issue the upgrade.  PSDMF ⁋ 108.  Figueroa told Jerew that he did not instruct Hamilton to upgrade Kelly or permit her to do so, and he provided a signed statement averring as much.[4]  DSUMF ⁋ 110.  Jerew, along with a manager in Amtrak's Labor Relations Department and Associate Vice President of Station Operations Robert Jordan, then decided to terminate Hamilton's employment.  Def.'s Mem. Supp. Summ. J. ("Def.'s Mem.") at 15, ECF No. 19-2; PSDMF ⁋ 220.  Amtrak informed Hamilton of her termination by letter.  PSDMF ⁋ 112.

---

[4] Hamilton disputes this fact because "[a]ny statement obtained by Jerew is inadmissible hearsay as is any testimony by Jerew about what Mr. Figueroa told him."  PSDMF ⁋ 110.  The Court finds that this statement is not hearsay because it is not being introduced here for its truth, but to show its effect on the listener, Jerew.  *See* Fed. R. Evid. 801(c) (defining hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" and that is offered "to prove the truth of the matter asserted in the statement").

Hamilton appealed her termination, as well as the Hearing Officer's decision, to Amtrak's Labor Relations Department, which denied her request. *Id.* ¶¶ 121, 123. Hamilton could have, but did not, appeal this decision to the tribunal established under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. PSDMF ¶ 124.

Instead, Hamilton sued Amtrak, alleging that Amtrak unlawfully fired her for requesting FMLA leave. *See* Compl. ¶¶ 36–37. Amtrak now moves for summary judgment. Def.'s Mot. at 1. The motion is ripe.[5] Pl.'s Mem.; Def.'s Reply Mem. ("Def.'s Reply"), ECF No. 22.

## II.

To prevail at summary judgment, the moving party must "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). The moving party has the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it has met this burden, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up).

At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn" in her favor. *Anderson*, 477 U.S. at 255. But the nonmoving party's opposition must consist of more than mere unsupported allegations or denials; it must be supported by affidavits, declarations, or other competent evidence setting

---

[5] The Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324.  The nonmoving party must provide evidence that would permit a reasonable factfinder to find in her favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  A "mere . . . scintilla of evidence" in support of the nonmovant's position cannot defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252.

## III.

Amtrak first argues that Hamilton's FMLA claims are preempted by the RLA.  Although the Court holds that Hamilton's claims are not preempted, the RLA does limit the evidence the Court will consider.  Turning next to Hamilton's FMLA claims, the Court finds that Amtrak is entitled to summary judgment.  Hamilton has failed to produce evidence that would permit a reasonable jury to find that Amtrak either retaliated against her for taking FMLA leave or interfered with her ability to take leave.

## A.

Amtrak is mistaken that the RLA entirely preempts Hamilton's claims.  *See* Def.'s Mem. at 18.  The RLA's purpose is "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes."  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  The statute thus "establishes a mandatory arbitral mechanism" for two types of disputes—(1) "major" disputes, which "relate to the formation of collective bargaining agreements or efforts to secure them" and concern "rates of pay, rules or working conditions," and (2) "minor" disputes, which "grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."  *Id.* at 252–53 (cleaned up).  A dispute that involves rights "independent of the CBA" is neither "major" nor "minor" and is thus not covered by the RLA.  *See id.* at 256.  This is such a case.

Amtrak acknowledges that the RLA does not generally "bar claims arising under an independent federal statute."  Def.'s Mem. at 19; *see also Hawaiian Airlines*, 512 U.S. at 256 (instructing that "the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA").  Even though Hamilton's claims arise under the FMLA, Amtrak contends that the RLA bars them because their resolution depends on interpreting the CBA.  *See* Def.'s Mem. at 19.  As Amtrak sees it, the investigation and hearing that were conducted under Rule 24 of the CBA prevent Hamilton from challenging her termination here.  *See id.* at 22.  Not so.

Contrary to Amtrak's assertion, Hamilton's claims do not constitute "minor" disputes.  In other words, they are not "grounded in the CBA."  *Hawaiian Airlines*, 512 U.S. at 256.  The FMLA claims that Hamilton asserts here arise independent of the CBA.  *Cf. Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 55 (D.D.C. 2019) ("[T]he right not to be discriminated against by an employer as prescribed by federal and state laws" are "rights that are independent of the CBA[.]" (cleaned up)).  More, the Supreme Court has explained that "[t]he distinguishing feature" of a minor dispute is that it "may be conclusively resolved by interpreting the existing agreement."  *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 305 (1989).  Unlike some of the cases that Amtrak cites, Hamilton's claims do not hinge on competing interpretations of a CBA provision.  *Cf. VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 273 (N.D. Ill. 2018) (holding that the plaintiff's interference and failure-to-accommodate claims were "minor disputes subject to mandatory arbitration" because "an interpretation of the CBA would dispositively resolve" the employer's defenses).  Thus, the RLA does not operate to completely preempt Hamilton's claims.

With that said, the RLA remains relevant.  It operates as an "evidentiary guide" to the Court's analysis.  *Said*, 390 F. Supp. 3d at 54 (cleaned up).  If evidence requires the Court to interpret the CBA or evaluate Amtrak's compliance with it, the same concerns underlying the preemption doctrine are present—this Court is the improper forum for such disagreements because "[a]ny controversies regarding the interpretation or application of the collective bargaining agreement must be resolved pursuant to the Railway Labor Act."  *Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 216 n.16 (N.D.N.Y. 2014); *see also id.* (rejecting as "improper" the plaintiff's challenge to the employer's interpretation of the CBA).  So even though the RLA does not prevent this Court from hearing Hamilton's claims altogether, it limits the evidence that the Court will consider.  *Accord Said*, 390 F. Supp. 3d at 55 (acknowledging that "the plaintiff's claims seek to enforce rights that are independent of the CBA" but recognizing that "the RLA bar[red] it from considering much of the [plaintiff's] evidence" (cleaned up)).

Some of Hamilton's proffered evidence of pretext for her FMLA retaliation claim implicates the CBA, including the fairness of the CBA-prescribed investigation and hearing process.  For example, Hamilton disputes "that the investigation and hearing was 'fair and impartial'" under Rule 24 of the CBA because the hearing took place "without a key witness, Luis Figueroa" and Figueroa was instead interviewed later by Jerew.  PSDMF ⁋ 81.  She argues that Figueroa's absence "calls into question the reasonableness" of the hearing process and challenges whether the "so-called post-hearing 'investigation' . . . was legitimate."  Pl.'s Mem. at 26–27.  "To consider whether these procedures were irregular will require an interpretation of the relevant portions of the CBA," *Gilmore v. Union Pac. R.R. Co.*, No. CIV. S-09-2180, 2012 WL 3205233, at *8 (E.D. Cal. Aug. 2, 2012), which provides for a "fair and impartial

investigation," Def.'s Hamilton Dep. and Exs. at 74.  Because this evidence "clearly takes issue with" Amtrak's implementation of the CBA, the Court will not consider it as relevant in its analysis of Hamilton's FMLA claims.  *Said*, 390 F. Supp. 3d at 55; *see also Gilmore*, 2012 WL 3205233, at *8 (explaining that "evidence of pretext that . . . constitutes a collateral attack on the hearing procedures is not relevant because of the [RLA] preemption doctrine").

## B.

The Court next turns to Hamilton's FMLA claims.  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" rights protected by the statute.  29 U.S.C. § 2615(a)(1).  An employee may bring both retaliation and interference claims under the FMLA, as Hamilton has done here.  *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1375 (D.C. Cir. 2020).  The Court considers each claim in turn.

## 1.

Courts evaluate FMLA retaliation claims under the familiar *McDonnell Douglas* burden-shifting framework.  *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must first establish a prima facie case of retaliation.  *Waggel*, 957 F.3d at 1375.  The employer may then "rebut a *prima facie* case by putting forward evidence of a legitimate, nonretaliatory reason for the adverse action."  *Id.*  Finally, "[t]he plaintiff must identify evidence of pretext in order to overcome the employer's rebuttal and survive summary judgment."  *Id.* at 1375–76.

"[O]nce the employer asserts a legitimate, non-discriminatory reason," however, "the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.) (cleaned up) (applying *McDonnell Douglas* in the Title VII

context); *see also Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 100 & n.4 (D.D.C. 2016) (applying *Brady* in the FMLA context and explaining that "the D.C. Circuit has held that the analytical framework for a claim of retaliation under [the] FMLA is the same as that applicable to a claim of discrimination under Title VII" (cleaned up)).

That is the case here.  Amtrak has proffered a "legitimate, non-discriminatory reason" for its challenged decision—that Hamilton upgraded a customer without charge in violation of its policies.  *See Brady*, 520 F.3d at 493; Def.'s Mem. at 24–25; *see also* Def.'s Hamilton Dep. and Exs. at 163, 181 (Amtrak's policies).  The Court therefore "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*"  *Thomas*, 227 F. Supp. 3d at 100 (quoting *Brady*, 520 F.3d at 494).

Thus, the Court turns to the "central issue"—whether Hamilton has "produced evidence sufficient for a reasonable jury to find that [Amtrak's] stated reason was not the actual reason" for her termination.  *Brady*, 520 F.3d at 495.  She has not.

"A plaintiff opposing summary judgment may raise an inference that the employer's purpose was retaliatory by pointing to evidence attacking the employer's proffered reasons, together with other evidence, if any, suggesting that retaliation was the real reason."  *Thomas*, 227 F. Supp. 3d at 100 (quoting *Allen v. Johnson*, 795 F.3d 34, 39–40 (D.C. Cir. 2015)). Hamilton contends that Amtrak's proffered reason is pretextual because (1) she did not provide the upgrade that was the basis for her firing; (2) her firing took place in close temporal proximity to her last FMLA leave request; (3) she was treated more harshly than other employees; and (4) another employee, Cynthia Thurston, expressed animus towards her taking FMLA leave.  *See* Pl.'s Mem. at 25, 27–28, 30.  Each argument falls short.

*First*, Hamilton argues that she has "consistently denied that she provided an upgrade on the day in question." *Id.* at 28.  But whether Hamilton in fact provided the upgrade is beside the point.  "[T]he essential question is not whether the plaintiff actually engaged in any wrongdoing, but whether [Amtrak] honestly and reasonably believed" that she did.  *Burns v. Wash. Metro. Area Transit Auth.*, 918 F. Supp. 2d 35, 43 (D.D.C. 2013); *accord Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

Amtrak's belief that Hamilton issued the upgrade was reasonable.  And Hamilton has not shown otherwise.  Amtrak concluded that Hamilton issued the upgrade after conducting an internal investigation and a hearing at which Hamilton presented evidence and witnesses.  *See* Def.'s Mem. at 28.  As explained, the Court does not consider some of Hamilton's challenges to the reasonableness of Amtrak's hearing procedures relevant because, at bottom, they would require the Court to opine on Amtrak's implementation of the CBA.  But even if the Court were to consider Hamilton's evidence in this regard, it would not be enough for Hamilton to overcome summary judgment.[6]

For example, Hamilton argues that the hearing was not "fair and impartial" because Luis Figueroa—who she claims directed her to issue the upgrade—was not present.  PSDMF ¶¶ 81, 83; Pl.'s Mem. at 26.  Hamilton questions the motive for Figueroa's absence because Amtrak permitted him to take vacation leave on the date of the hearing.  *See* Pl.'s Mem. at 26–27.  But

---

[6]  Whether the RLA prevents federal courts from hearing certain disputes "is a jurisdictional issue."  *Said*, 390 F. Supp. 3d at 52.  But the same jurisdictional concerns are not implicated when, as here, the RLA's preemption doctrine is used only "as an evidentiary guide."  *Id.* at 54 (quoting *Gilmore*, 2012 WL 3205233, at *8).  Thus, the Court is not barred from explaining that the outcome of Hamilton's retaliation claim does not turn on this evidence.

the only evidence that she provides are the unremarkable statements in Thurston's deposition that Figueroa was on vacation at the time of the hearing and that a manager's approval was required for an employee to change his vacation days. *See* PSDMF ⁋ 81; Pl.'s Mem. Ex. D ("Pl.'s Thurston Dep.") at 60–62, ECF No. 20-9.  And while Hamilton cites her own deposition, in which she stated that Amtrak "moved [Figueroa's] vacation so he didn't have to go to the hearing," she provides no independent evidence to support her assertion. *See* PSDMF ⁋ 83; Pl.'s Mem. Ex. A ("Pl.'s Hamilton Dep.") at 40–41, ECF No. 20-2.  More, Hamilton acknowledged in her deposition that her union did not request that the hearing be postponed because of Figueroa's absence.  Pl.'s Hamilton Dep. at 41.  Nor has she presented evidence that she tried to summon him to participate in her hearing. *See* Def.'s Reply at 6.

Hamilton has not shown that Amtrak prompted Figueroa to take vacation leave on the day of her hearing to prevent him from testifying.  And Jerew's later interview of Figueroa cuts against any suggestion that Amtrak intentionally excluded him from providing information. *See* PSDMF ⁋⁋ 108–09.  Although Hamilton questions this post-hearing investigation too, *see* Pl.'s Mem. at 26–27, she points to no evidence showing that Amtrak's efforts to investigate the allegations against her and its belief that she committed the acts charged were anything but reasonable.  Thus, Hamilton "has not cast any real doubt on" the reasonableness of Amtrak's stated beliefs about her conduct. *Williams v. Verizon Wash., D.C. Inc.*, 304 F. Supp. 3d 183, 197 (D.D.C. 2018).

*Second*, Hamilton relies on timing.  She points to the "close proximity in time" between her termination and her FMLA requests.  Pl.'s Mem. at 25.  The parties dispute how to measure temporal proximity.  Even if Hamilton's assertion is correct—that Amtrak charged her with the ticket upgrade violation "a mere 45 days after her leave estimate was increased significantly and

less than a month after her last request for FMLA leave"—temporal proximity alone cannot constitute a showing of pretext. *Id.* at 23 (emphasis omitted). Rather, "dislodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires positive evidence beyond mere proximity." *Waggel*, 957 F.3d at 1376 (cleaned up). Hamilton has proffered no such positive evidence.

*Third*, Hamilton argues that she was treated too harshly for a first-time offense. *See* Pl.'s Mem. at 27. She contends that she "had never been disciplined during her 20 years of service" for any similar misconduct and that the total cost to Amtrak of the alleged upgrade was only $471. *Id.* at 27–28. To support that her termination was too harsh, Hamilton points to a "District Manager of Stations," who she contends also gave improper upgrades but was treated more favorably—rather than terminating him, Amtrak issued him a counseling letter and required him to take training courses. *Id.* at 28–29.

A plaintiff can prove that she is similarly situated to another employee by showing "that she and the alleged similarly-situated employee were charged with offenses of comparable seriousness, and that all of the relevant aspects of her employment situation were nearly identical to those of the other employee." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (cleaned up). Whether another employee is an appropriate comparator depends on factors such as "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).

The District Manager is not an appropriate comparator.  First, he and Hamilton did not share the same job or job duties.[7]  The District Manager had the authority to provide complimentary upgrades.  PSDMF ⁋ 127.  Hamilton did not.  *Id.* ⁋ 132.  So while he may have misused his authority, she arrogated to herself authority she did not possess at all—a more dramatic violation of corporate policy.  *See* Def.'s Jerew Dep. and Exs. at 35–37; Def.'s Hamilton Dep. and Exs. at 163, 181.

More, the circumstances surrounding the District Manager's and Hamilton's offenses were dissimilar.  The District Manager was found to be candid about his conduct.  *See* Def.'s Reply at 13.  He explained that, following the practice of prior managers, he granted a long-time premium customer the ability to use an empty room (adjacent to the one the customer had purchased) to work only when the room was not sold.  *Id.*; PSDMF ⁋⁋ 130–31.  In contrast, the Hearing Officer did not credit Hamilton's explanation that Figueroa directed her to issue the upgrade and instead concluded that she acted of her own accord.  *See* Def.'s Reply at 13–14; *see also* Def.'s Hamilton Dep. and Exs. at 228; PSDMF ⁋⁋ 105–06.

Although "whether two employees are similarly situated is ordinarily a question of fact for the jury," there is insufficient evidence from which a jury could reasonably conclude that the District Manager was similarly situated to Hamilton.  *Wheeler*, 812 F.3d at 1116.  Thus, Amtrak's termination of Hamilton as compared to its treatment of the District Manager "could

---

[7]  Hamilton points out that employees in different positions can sometimes be comparators if they are disciplined for following the same generally applicable rule.  *See* Pl.'s Mem. at 33; *Burley*, 801 F.3d at 302 (acknowledging that as a general matter, "the mere fact that two employees had different titles and duties does not necessarily undermine the probative value of their different treatment").  The misconduct here, however, is intertwined with job duty.  As Amtrak reasoned, the District Manager's conduct was found to be less serious because his role gave him the authority to issue complimentary upgrades.  Def.'s Reply at 12–13.

not support a jury conclusion" that Amtrak terminated Hamilton for taking FMLA leave.
*Burley*, 801 F.3d at 302; *see also Steele*, 535 F.3d at 692.

*Fourth*, Hamilton asserts that "Thurston's animus towards" Hamilton because of her
FMLA leave is evidence of pretext. Pl.'s Mem. at 30. Assuming that Hamilton has produced
enough evidence for a reasonable jury to conclude that Thurston harbored animus towards
Hamilton, she still has not produced evidence that Thurston influenced her termination.
Hamilton does not dispute that Thurston was not involved in the decision to proceed with formal
charges and did not decide to terminate her. PSDMF ¶¶ 78, 220 ("The decisionmakers in the
decision to terminate Plaintiff's employment were Michael Jerew, Robert Jordan, and an
individual in Amtrak's labor relations department.").

Rather, she asserts that Thurston influenced Jerew, one of the decisionmakers. *See* Pl.'s
Mem. at 24. It is true that "evidence of a subordinate's bias" can be relevant where "the ultimate
decisionmaker is not insulated from the subordinate's influence." *Griffin v. Wash. Convention
Ctr.*, 142 F.3d 1308, 1310 (D.C. Cir. 1998). But if the decisionmaker is not "dependent upon a
biased subordinate's opinion" or is able to "independently . . . assess the basis for sanctioning an
employee," it is unlikely that the bias of a subordinate will be relevant. *Hampton v. Vilsack*, 685
F.3d 1096, 1101–02 (D.C. Cir. 2012) (cleaned up).

Hamilton has not put forward evidence that Thurston's influence led to her termination.
Hamilton seems to rely in part on another employee sharing with her that he heard Clark say to
Thurston (apparently referring to the ticket upgrade incident), "[w]ell, since we couldn't get her
on FMLA, at least we got her on this." PSDMF ¶ 111; Pl.'s Hamilton Dep. at 6. But that
statement is inadmissible. Hamilton is offering it for the truth of the matter asserted—to show
that holding Hamilton accountable for the upgrade was pretextual—rendering it hearsay. *See*

Fed. R. Evid. 801(c).  The Court therefore declines to consider it.  *Cf. Thomas*, 227 F. Supp. 3d at 108 ("Although a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." (cleaned up)).

There is also no evidence of a material connection between Thurston and any of the individuals who decided to terminate Hamilton's employment.  Hamilton contends that Thurston forwarded Hamilton's FMLA leave requests to Clark, who worked directly with Jerew.[8]  *See* Pl.'s Mem. at 24.  Even if this is true, though, simply passing along recorded FMLA leave does not constitute recommending that Hamilton be fired.  And it does not show that Thurston had any direct contact with Jerew about Hamilton.  Hamilton also suggests that Thurston was involved in her termination because she reported the upgrade incident and testified at the hearing.  *See* PSDMF ¶ 120.  But this shows only that Thurston communicated facts, not that she recommended Hamilton's termination.  *Cf. Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079–80 (D.C. Cir. 1999) (stating that a subordinate "merely communicated the facts" and that the plaintiff had "offer[ed] no evidence that [the subordinate] recommended" that the plaintiff be discharged).

A plaintiff's right to FMLA leave does "not protect an employee's job against a legitimate, unrelated, reason for separation from employment."  *Williams*, 304 F. Supp. 3d at 194 (cleaned up).  Amtrak has provided a legitimate reason for Hamilton's termination.  For her part, Hamilton has failed to show evidence of pretext sufficient for a reasonable jury to find that

---

[8]  Amtrak asserts that Thurston's only responsibility would have been to record the employee's stated reason for her absence. Def.'s Reply at 9.  This dispute is not material to the Court's resolution of Hamilton's retaliation claim.

Amtrak's stated reason was pretextual.  The Court will therefore grant Amtrak's motion for summary judgment as to Hamilton's FMLA retaliation claim.

**2.**

Finally, the Court considers Hamilton's interference claim.  "To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference."[9]  *Waggel*, 957 F.3d at 1376.  A plaintiff can "succeed on an interference claim without showing that her employer denied her any leave she requested."  *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 164 (D.C. Cir. 2015) (cleaned up).  "Prejudice exists where an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief."  *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 144 (D.D.C. 2010).

To begin with, Hamilton does not dispute that Amtrak repeatedly *approved* her requests for FMLA leave.  *See, e.g.*, PSDMF ⁋ 22 (not disputing that Amtrak approved her request to take intermittent leave during a one-year period); *id.* ⁋ 28 (not disputing that Amtrak approved her request to take intermittent leave during another one-year period); *id.* ⁋ 32 (not disputing that Amtrak approved her request to take continuous leave for a ten-day period).  Hamilton argues,

---

[9]  Some courts have described the elements of an FMLA interference claim differently, explaining that a plaintiff "must prove that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled."  *Elzeneiny v. District of Columbia*, 195 F. Supp. 3d 207, 217 (D.D.C. 2016) (cleaned up).  The parties do not dispute that Amtrak is covered by the FMLA, that Hamilton was eligible for the FMLA's protections and entitled to take FMLA leave, or that Hamilton provided enough notice of her intent to take leave.  *See* Pl.'s Mem. at 15–16; Def.'s Reply at 17–22.

however, that Amtrak's other actions interfered with her ability to take FMLA leave.  She contends (1) that Thurston improperly recorded her FMLA leave; (2) that Amtrak treated her initial certification as a maximum allowable leave and improperly asked her to recertify; and (3) that Thurston shared information about her FMLA leave with other employees.  None of these is persuasive.

*First*, Hamilton asserts that Thurston was irritated by her requests for leave and improperly recorded her FMLA leave as sick time or unexcused absences.  Pl.'s Mem. at 16, 19.  But the deposition testimony that Hamilton cites suggests only that Thurston generally experienced frustration when Amtrak would be shorthanded because of employees taking FMLA leave.  *See* Pl.'s Thurston Dep. at 36–37; *see also* PSDMF ⁋ 185.  And even if Hamilton is correct that Thurston was frustrated by her specifically and that Thurston misrecorded her time, she has not produced evidence that she was prejudiced.

Hamilton contends that the improper recording of her time led to the "loss of sick leave and increased discipline."  Pl.'s Mem. at 16.  But as Amtrak points out, Hamilton could have disputed the discipline notices she received for her absences, but chose not to do so; instead, she chose to accept discipline in the form of suspensions.  *See* Def.'s Hamilton Dep. and Exs. at 139–40, 150–52, 157–58; *see also* PSDMF ⁋⁋ 43, 45, 47.  The Court cannot now entertain complaints about these disciplinary actions that Hamilton failed to contest.  And Amtrak cancelled one discipline notice when it confirmed that Hamilton's absences were FMLA-approved.  PSDMF ⁋ 48; Def.'s Reply at 19.  This cuts in Amtrak's favor.  It shows that employees would not receive discipline if mistakes were made in recording leave.

*Second*, Hamilton argues that Amtrak interfered with her ability to take FMLA leave by treating Hamilton's initial certification "as an *absolute maximum* for the time that she could take

off for FMLA." Pl.'s Mem. at 17 (emphasis in original).  She asserts that Amtrak acted

improperly by requesting that she recertify her FMLA leave in August 2018 when she went

beyond the amount of leave for which she was first approved—three times per year for three to

five days per episode.  *Id.*; *see also* Pl.'s Warner Dep. Exs. at 9, 12, 14; PSDMF ⁋⁋ 21–23.  For

support, Hamilton relies on *Hansen v. Fincantieri Marine Group*, in which the Seventh Circuit

explained that "if the frequency and duration stated in the certification set a limit to the

employee's entitlement to FMLA leave, there would be no need for the regulation that authorizes

an employer to request recertification."  763 F.3d 832, 842 (7th Cir. 2014).  The court

determined that the employer there "should have sought recertification when the frequency of

[the plaintiff's] absences exceeded what was estimated in his certification, rather than simply

denying him leave."  *Id.*

      Here, the record shows that Amtrak did not treat Hamilton's initial certification as the

maximum allowable leave and deny her leave in excess of that amount.  It simply asked

Hamilton to recertify her leave after Hamilton's manager believed her "pattern of absences ha[d]

exceeded the expected frequency and duration," as authorized by FMLA regulations.[10]  *See* Pl.'s

Warner Dep. Exs. at 12, 14; *see also* 29 C.F.R. § 825.308 (stating that employers can request

recertification every 30 days in connection with an employee's absence or more often if

"[c]ircumstances described by the previous certification have changed significantly").  Hamilton

has thus not shown that Amtrak interfered with her ability to take FMLA leave by requesting that

she recertify.  Hamilton also cannot prove prejudice.  Amtrak approved Hamilton for an even

greater amount of FMLA leave after it requested recertification.  *See* PSDMF ⁋ 28 (not disputing

---

[10]  The parties dispute whether Hamilton submitted information in response to this request.
PSDMF ⁋ 146; Def.'s Resp. ⁋ 146.  This fact, however, is not material to the Court's resolution
of Hamilton's interference claim.

that Amtrak approved another leave request in December 2018).  Her approved leave ballooned from an estimated 120 hours per year to an estimated 528 hours per year.[11]

*Third*, Hamilton suggests that Thurston informing other employees that Hamilton took FMLA leave constituted interference.  *See* Pl.'s Mem. at 20.  Assuming that Thurston shared Hamilton's information, there is also evidence in the record that Hamilton herself let co-workers know about her FMLA leave.  *See* Pl.'s Thurston Dep. at 30.  More importantly, Hamilton does not explain how sharing this information "interfere[d] with, restrain[ed], or den[ied] the exercise of" her FMLA rights.  *Waggel*, 957 F.3d at 1376.  She does not dispute that she returned to the same position with the same rate of pay and benefits each time she returned from FMLA leave, and she does not argue that this conduct otherwise prejudiced her.  *See* PSDMF ⁋ 20 (stating that Amtrak interfered "in ways not directly related to the position to which she returned, her rate of pay and benefits").

In sum, Hamilton has failed to produce evidence that would permit a reasonable jury to find in her favor on the FMLA interference claim.  Amtrak is entitled to summary judgment.

---

[11]  The initial certification estimated leave three times per year for up to five days per episode.  Pl.'s Warner Dep. Exs. at 9.  Based on eight-hour workdays, this would amount to 120 hours of leave per year.  *See* Def.'s Reply at 11 n.8.  The second certification estimated intermittent leave for appointments two times per month for two hours each and for flare-ups five times per month for up to eight hours per episode.  Pl.'s Warner Dep. Exs. at 17.  As Amtrak points out, this would amount to 528 hours of leave per year.  *See* Def.'s Reply at 11 n.8.  The Court notes that 528 hours of leave per year is likely in excess of the "12 workweeks of leave" per year required by the FMLA.  29 U.S.C. § 2612(a)(1).  Based on a 40-hour workweek, which it seems Hamilton was subject to, the FMLA would entitle Hamilton only to 480 hours of leave per year.  *See* Def.'s Hamilton Dep. and Exs. at 231 (stating Hamilton's assigned hours and rest days).

**IV.**

For all these reasons, the Defendant's Motion for Summary Judgment will be granted.  A separate Order will issue.

Dated: November 18, 2020                    TREVOR N. McFADDEN, U.S.D.J.